Michael D. Stanger #10406
Miriam Allred #15982
STRONG & HANNI, PC
102 South 200 East, Suite 800
Salt Lake City, Utah 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508
mstanger@strongandhanni.com

*Attorneys for Plaintiff Todd Andra*

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TODD ANDRA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MOBILEONE, LLC an Arizona limited liability company,<br><br>Defendant. | **COMPLAINT**<br><br>**(Jury Demanded)**<br><br>Case No. 2:23-cv-00188-JNP<br><br>Judge Jill N. Parrish |

Plaintiff Todd Andra ("Todd") complains against Defendant MobileOne, LLC ("MOLLC") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Todd Andra is an individual residing in Alpine, Utah.

2. Defendant MobileOne, LLC is an Arizona limited liability company with its headquarters in La Jolla, California.

3. This Court has original jurisdiction of this civil action under 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between the parties and the amount in

1

controversy exceeds $75,000. Complete diversity exists because Todd is a citizen of Utah and MOLLC is a citizen of California, where its principal place of business is located.

4. This Court has personal jurisdiction over MOLLC because it has engaged in minimum contacts with Utah and exercising jurisdiction over MOLLC would not offend traditional notions of fair play and substantial justice. The Court may exercise general personal jurisdiction over MOLLC because it is essentially at home in this jurisdiction due to its ongoing, systematic, and continuous business with persons in this State. Moreover, this Court has specific jurisdiction over MOLLC because it entered into a contract of employment with Todd, a citizen of Utah, which contract was to be performed in Utah, and which contract MOLLC breached, causing injury to Todd in the state of Utah.

5. Venue is proper under 28 U.S.C. § 1391(b)(1), because MOLLC is an entity with capacity to sue and be sued in its common name under applicable law, and resides in this venue by virtue of this Court's personal jurisdiction.

6. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Utah. These events include MOLLC contracting with and employing Todd, and breaching that contract, causing injury to Todd in the state of Utah.

7. Alternatively, to the extent venue is not proper under 28 U.S.C. §§ 1391(b)(1) or (2), then there is no district in which this action may otherwise be brought under Sections 1391(b)(1) and (2), and venue is, therefore, proper under 28 U.S.C. § 1391(b)(3), because MOLLC is subject to this Court's general and specific personal jurisdiction for the reasons set forth above and below.

**FACTUAL ALLEGATIONS**

8. Prior to being hired by MOLLC, Todd worked for The Mobile Source, LLC ("The Mobile Source"), which operated 33 T-Mobile retail stores in Utah, Montana and Idaho.

9. MOLLC is also a T-Mobile dealer, and prior to July 1, 2022, was operating stores in Washington, Oregon, California, Arizona, New Mexico, Oklahoma and Texas.

10. The Mobile Source was one of the crown jewels of the T-Mobile dealer network.

11. The Mobile Source was consistently ranked near the top on T-Mobile's stack ranker, which graded dealers against each other, regularly achieving the number one spot and almost always in the top five.

12. The Mobile Source's chargeback amounts were the lowest of all T-Mobile dealers because they and their sales crew did business with integrity.

13. The Mobile Source's customer experience scores were the highest for all T-Mobile dealers.

14. The Mobile Source was extremely profitable because of the way it recruited, trained, paid, and treated its sales staff.

15. Indeed, The Mobile Source had the lowest turnover of all T-Mobile dealers because of the way it hired, trained and compensated its employees.

16. For example, because of the lag time between sales being made by employees and the relevant commissions appearing on employee paychecks, The Mobile Source paid a premium up front for new employees, ensuring that they got good first checks and were not discouraged into quitting.

17. The Mobile Source had three full time trainers for in-person training provided at its various stores, and spent significant resources to fly employees to training sessions and to train up

new employees in their first ninety days and afterwards.

18. The Mobile Source staffed its stores with large complements of employees, setting a minimum floor of labor hours per store per week, to keep customer wait times down and minimize employee stress and burnout, and the numbers proved the wisdom of this philosophy: the more people that were working in a store at a given time, the higher the revenues were, and the better the customer experience was.

19. The Mobile Source did not expect Store Managers to bear the sole responsibility for recruiting, paying thousands of dollars to Indeed and other recruiting services.

20. The Mobile Source's compensation system for salespersons was fair and rewarded/incentivized success, such that salespersons, Store Managers, etc., all had significant opportunities to earn money far in excess of a typical hourly wage in the industry.

21. It was because of The Mobile Source's superlative performance that it was hand-selected by T-Mobile to open the Montana market.

22. The Mobile Source stores never averaged below $44,000 in gross profit every month, while MOLLC's stores, in higher traffic areas and bigger cities, averaged only $26,000 per store per month.

23. It was well known by MOLLC, T-Mobile, and in the industry in general, that Todd's skills as a sales leader were integral to the success of The Mobile Source.

24. Todd is a 20-year veteran of the industry, who supervised sales for the Mobile Source on a company-wide basis, and helped keep the salesforce seasoned, trained and happy.

25. Todd was and is revered by T-Mobile for his sales performance and ethics.

26. Because of the success of The Mobile Source, MOLLC agreed to purchase those stores at a premium.

27. The sale was accomplished pursuant to a written Asset Purchase Agreement between MOLLC, The Mobile Source, and Thomas Andra ("Tom"), effective as of July 1, 2022 ("the APA").

28. MOLLC paid 3.5 time more per store for The Mobile Source's stores than it had for any others.

29. The parties to the APA agreed that Todd's employment would be a material part of the deal, and attached to the APA as its Exhibit "E" an Employment Agreement between MOLLC and Todd.

30. The APA contains the following paragraph 11.6:

> 11.6   Attorneys' Fees. Without limiting any other provision hereof, if any action, suit, arbitration or other proceeding for the enforcement of this Agreement is brought, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions hereof, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that proceeding, in addition to any other relief to which it may be entitled.

31. Indicative of the value Tom and The Mobile Source ascribed to Todd, the Employment Agreement provided that Todd would be employed for a term of at least three years with a monthly salary of at least $27,973.

32. Section 5.2 of Todd's Employment Agreement provided that, in the event his employment was terminated without cause, he would be paid out for the remaining portion of the three-year term at $22,000 per month (a $6,000 savings over the cost of continuing to employ him for that period).

33. Section 5.1 of the Employment Agreement defined cause as follows:

    5.1.1 Employee becomes disabled and is unable to perform the services required of her under this Agreement and it is anticipated that such disability is to continue for a period of three (3) or more months.

    5.1.2 Employee commits acts of fraud or deceit that affect Company, its business or its customers, or could reasonably be interpreted to adversely affect Company, its business or its customers.

    5.1.3 Employee commits any act under any criminal statute classified as a felony, whether or not all appeal rights have been exhausted.

    5.1.4 Employee breaches or neglects the material duties or covenants which Employee is required to perform and adhere to under the terms of Employee's employment and fails to cure within a reasonable period of time following written notice.

    5.1.5 Employee's work performance or incompetence results in Employee's inability to reasonably perform Employee's duties after reasonable counseling, documentation and clear objectives are set and unmet and fails to cure within a reasonable period of time following written notice.

   34. Unfortunately, unbeknownst to Todd, at the time it was negotiating and executing the APA and the Employment Agreement, MOLLC had no intention of employing Todd for the full three-year term.

   35. Instead, MOLLC's intention was to quickly learn what it could from Todd about The Mobile Source's success, and then fabricate cause to terminate him.

   36. One of MOLLC's owners, David Licavoli, set up the relationship between Todd and MOLLC's VP of Sales, Nicholas Guarine, as adversarial and competitive from day one, telling The Mobile Source, "I hope Todd kicks Nick's ass." Such language was typical of the profanity-laced management style at MOLLC.

   37. Based on these communications, Todd understood that he was free to question the wisdom of Mr. Guarine's and MOLLC's sales tactics, because MOLLC wanted to learn and benefit from the expertise and long-term history of success Todd and The Mobile Source brought to the table.

   38. But in reality, MOLLC was intending to use Todd's competition with Mr. Guarine

as a pretext for terminating Todd for a lack of "loyalty" to existing MOLLC management.

39. Todd was never provided a written job description that would spell out his responsibilities to MOLLC, but such an approach was typical of how MOLLC managed its employees; indeed, Mr. Guarine advised Todd to "never put anything in writing" so that his subordinates could never hold him accountable.

40. Many of the practices and procedures MOLLC insisted Todd and his sales staff follow were specifically designed to make the stores MOLLC had just purchased less profitable, and Todd understandably pushed back against those changes.

41. For example, MOLLC immediately got rid of in-person training and eliminated two of the three trainers at the same time as 19 other stores were being added to Todd's area.

42. MOLLC required Store Managers to handle recruiting, eliminating the paid recruiting services of The Mobile Source, taking Store Managers away from the sales process, thereby reducing sales.

43. As opposed to The Mobile Source's minimum labor hours per store per week floor, MOLLC set a maximum labor hours per store ceiling which left the stores understaffed and unable to meet customer needs, resulting in lost sales.

44. But Guarine and MOLLC didn't care about the low revenues because they were using additional questionable tactics to manipulate their conversion numbers and deceive T-Mobile into believing they were more efficient salespersons.

45. Specifically, Guarine and MOLLC instructed Todd's subordinates to place barriers to entry in front of the stores so that customer egress was made more difficult.

46. Guarine and MOLLC specifically called this practice "Playing Defense."

47. This might include tables with balloons or other physical obstacles, or it might

7

include the salesperson standing outside the store to deter casual customers from entering.

48. Because customer conversion scores only account for those who physically enter the store, MOLLC took steps to prevent entry until it was clear that a customer intended to make a purchase, thus making it appear that MOLLC's sales staff was doing an incredible job converting a high percentage of store traffic into paying customers, when in fact, a large number of customers are being driven away before they even cross the store's threshold.

49. When Todd first saw that tables were being set up to impede access to his stores, he removed them and told MOLLC/Guarine that he could not understand the logic of such tactics.

50. MOLLC/Guarine informed Todd that this artificial inflation of conversion stores was part of MOLLC's strategy for success in order to receive recognition (including the rights to purchase additional stores, including potentially the Metro by T-Mobile corporate stores that T-Mobile was contemplating selling) and compensation/rewards from T-Mobile.

51. To this end, MOLLC recognized store managers and regions within their company for high conversion rates, even when those stores or regions had horrible revenue (as a result of having driving traffic away).

52. This recognition included stores being called out by Mr. Guarine on group calls as doing a good job "Playing Defense."

53. Todd told Guarine/MOLLC that he felt this was unethical and dishonest, and bad business, but was instructed that he should make the low traffic/high conversion rate strategy part of his practice for MOLLC.

54. Todd also discovered that fraudulent sales were happening in some stores in Idaho with MOLLC's knowledge and under Guarine's leadership as part of MOLLC's "sales at all costs" inflate the numbers strategy.

55. Specifically, existing customers were being charged for new activations without their knowledge; this was referred to as a "SIM card in a bag" sale, in which the customer would be charged for an add-on project, but never received the device.

56. The chargeback numbers from these stores show a significant number of cancellations and corresponding chargebacks once the customers grew wise to the fraudulent activations.

57. Todd challenged these practices, but was told to mind his own business.

58. Only three weeks after MOLLC's purchase of the new stores, Todd's assistant was removed from her position supporting him, and he was sent home and instructed not to communicate with his team.

59. He was not even provided with an explanation for the suspension for almost a week, during which time MOLLC leadership attempted to undermine Todd to his team.

60. The timing of the suspension coincided with the transition of the 19 new stores to Todd's leadership, undercutting his ability to manage that transition.

61. MOLLC/Guarine used the suspension as an opportunity to endear themselves to Todd's subordinates and undermine him, specifically soliciting complaints about Todd's leadership.

62. When reasons were finally given, it was apparent that Todd wasn't even allowed to disagree with management, no matter how stupid or inane their suggestions were, and that any such disagreement would be treated as "cause" for termination.

63. Effectively, MOLLC wanted to muzzle Todd, a strange approach to an employee whose sales efforts had led to far more success than anything MOLLC itself had even dreamed of achieving.

64. In or about September of 2022, one of the stores overseen by Todd dealt with a sexual harassment problem, when it was reported that a store manager had taken an underage female employee out drinking after work and kissed her.

65. After an investigation in which more employees indicated they had received inappropriate sexual attention from the store manager, the store manager was terminated.

66. This upset the employee's district manager, Alex Orquiz, who had been profiting from the sales of that store manager, and felt the termination was not justified, attempted to excuse the behavior, and complained repeatedly and vociferously to Todd about the termination.

67. Todd, however, felt strongly about the termination being justified, and forcefully told Mr. Orquiz so, stating that Mr. Orquiz should stop talking about the issue because it was making him question Mr. Orquiz' judgment.

68. Mr. Orquiz then complained to MOLLC about his treatment by Todd.

69. Already looking for an opportunity to get rid of Todd, rather than being proud of Todd for taking a stand against sexual harassment, MOLLC seized on Todd's "anger" issue and wrote Todd up, requiring that he attend counseling to improve his interpersonal skills, uphold a "positive demeanor," and adopt the "MobileOne management style."

70. Todd did push back on the suggestion that he had mistreated Mr. Orquiz, giving the specifics of the conversation and insisting that he had been defending the company's decision to terminate the store manager and uphold its policies against sexual harassment.

71. MOLLC used this opportunity to bring in many of Todd's district managers and solicited their opinions on Todd's demeanor and future with MOLLC, at least implicitly undercutting Todd's authority and suggesting that these district managers may have the opportunity to replace Todd if they were good team players and provided dirt on Todd.

72. Nevertheless, Todd carefully and conscientiously attended the counseling sessions, took careful notes, and implemented the lessons from the counseling.

73. However, because MOLLC had always intended to terminate Todd and now believed it had learned all it needed regarding The Mobile Source's success, it used Todd's treatment of Mr. Orquiz as a major factor in deciding to terminate Todd.

74. Nevertheless, under Todd's leadership, July-October proved to be fantastic sales months for his team, which was doing even better than they had before the sale, such that MOLLC could not point to incompetence to justify a termination.

75. Todd's team had something to prove to MOLLC, and the competition against other regions helped.

76. In these months, Todd led his stores to the highest gross profit per location over any other region with the lowest customer chargeback, while doing so in smaller markets than he was competing against.

77. As proof of his sales leadership and prowess, Todd won a $4,000 Samsung reward in September because his area was #1 all four weeks of the month, which reward MOLLC never paid (it was typical of MOLLC during Todd's time there to offer rewards and incentives which were never paid).

78. And importantly, this success was enabled by the fact that MOLLC had not changed its compensation model for those stores that came over from The Mobile Source.

79. However, effective November 1, MOLLC made changes to the compensation model that were devastating to efforts to retain staff at Todd's stores.

80. Under the new model, a capable salesperson lost significant portions of his/her income. Todd foresaw the destructive impact of the change, and requested a Zoom call so he could

provide an apples-to-apples comparison of the new plan vs. the old and how his sales staff would be impacted.

81. Todd prepared a detailed PowerPoint presentation showing just how destructive the new plan would be to the compensation of salespersons and store managers, but MOLLC would not listen.

82. The changes were so devastating that many of Todd's top salespersons resigned, with some not even giving notice of their intent to quit.

83. With this loss of staff, the Store Managers themselves had to pick up shifts, often working 6-7 days a week for which they were paid no overtime, despite not having the requisite job duties and responsibilities to be exempt from overtime requirements of the Fair Labor Standards Act.

84. Todd was vocal about the impact the number of resignations would have on his Store Managers and the remaining staff, but was again ignored.

85. With this massive exodus of experienced salespersons, sales tanked.

86. The 33 stores purchased from The Mobile Source had done nearly $2 million in sales the prior November, but only achieved $1.27 million in November 2022, which, with Black Friday and corresponding promotions, should have been a phenomenal month for sales.

87. Of course, MOLLC blamed this on Todd, and not on their incredibly short-sighted changes to the compensation system and the training and culture Todd had instilled, and their inability to manage the stores as well as The Mobile Source had.

88. But Todd continued to advocate for his sales staff and push back against the changes that were harming them.

89. MOLLC continued to tweak employee compensation, often without notice to the

employees, and Todd complained that such tactics were at best imprudent, and perhaps unlawful.

90. With the massive drop in sales, the amounts MOLLC was contractually obligated to pay Todd became harder to justify; he would need to be terminated, and paid as little as possible.

91. Conveniently, MOLLC was able to point to the drop in sales and claim it was due to Todd's incompetence, and would also reference his "anger" and pushback against stupid or unethical management decisions made by MOLLC as a basis for allegedly terminating him "for cause."

92. MOLLC's actions towards Todd were willful and malicious and manifested a knowing and reckless indifference toward Todd and disregard of Todd's rights.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

93. Todd restates and realleges each of the foregoing allegations as if fully set forth herein.

94. The Employment Agreement is a valid, enforceable agreement.

95. Todd performed all his duties under Employment Agreement or is excused from performing such duties (i.e., because his employment has been terminated).

96. MOLLC has failed to perform its duties under the Employment Agreement and breached that agreement by failing and refusing to pay Todd the severance compensation contemplated by Paragraph 5.2 of the Employment Agreement and instead fabricating "cause" for his termination.

97. As a direct result of MOLLC's breach of the Employment Agreement, Todd has been damaged in an amount not less than $638,000.

### SECOND CAUSE OF ACTION
**(Breach of the Covenant of Good Faith & Fair Dealing)**

98. Todd restates and realleges each of the foregoing allegations as if fully set forth herein.

99. Inherent in every contract, including the Employment Agreement, is an implied duty/covenant of good faith and fair dealing.

100. MOLLC has breached that covenant of good faith and fair dealing in at least the following ways:

   a. Never providing Todd a written job description;

   b. Terminating Todd without cause;

   c. failing and refusing to pay Todd the severance compensation contemplated by Paragraph 5.2 of the Employment Agreement; and

   d. Terminating Todd for communicating his disapproval of MOLLC's approach to sexual harassment allegations against a managerial employee.

101. As a direct and proximate cause of MOLLC's breaches, Todd has been damaged in an amount to be proved at the hearing of this matter, but at least $783,000.

### THIRD CAUSE OF ACTION
**(Fraud in the Inducement)**

102. Todd restates and realleges each of the foregoing allegations as if fully set forth herein.

103. In negotiating the Employment Agreement, MOLLC, through David Licavoli, made representations to Todd that he would be free to continue to manage his stores as he saw fit and should feel free to express his opinions and compete against Mr. Guarine, but these representations were false.

104. MOLLC knew these representations were false, but made them in order to induce Todd to act on them.

105. Todd, acting reasonably, and in ignorance of the falsity of MOLLC's representations to him, was induced to rely on and did rely on those representations in entering into the Employment Agreement rather than pursuing other options, all to Todd's detriment and damage, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Wrongful Termination in Violation of Public Policy)

106. Todd restates and realleges each of the foregoing allegations as if fully set forth herein.

107. Todd's concerns regarding the sexual harassment and his reprimand of Mr. Orquiz' defense of it touched upon matters of clear and substantial public concern and public policy of the United States of America (Title VII) and the State of Utah (the Utah Antidiscrimination Act).

108. Todd's actions were protected and privileged by and brought into play clear and substantial public policies of the United States of America and the State of Utah.

109. MOLLC terminated Todd, at least in part, to punish him for his protected activity, such that his termination and his protected activity are causally connected.

110. As a direct and proximate result of the wrongful acts of MOLLC, Todd has been caused to suffer damages, including loss of his employment, loss of earnings, loss of earning capacity and damaged to his reputation and standing in the community, all in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment)

111. Todd restates and realleges each of the foregoing allegations as if fully set forth herein.

112. The Employment Agreement contains a clause that reads as follows:

> 4.2  <u>Non-Solicitation</u>.  During the term of this Agreement and for a one (1) year period following the termination of this Agreement, Employee shall not, directly or indirectly, induce or attempt to induce any employee of Company to leave such employment with Company.

113. Because MOLLC has breached the Employment Agreement, Todd believes he should be free to solicit MOLLC's employees.

114. The non-solicitation provision of the Employment Agreement and Todd's position on its enforceability create a justiciable controversy for resolution by the court.

115. Todd's and MOLLC's interests are adverse with respect to the solicitation of MOLLC employees by Todd.

116. Todd has a legally protective interest in resolution of this dispute, and the issue is ripe for judicial determination.

117. Wherefore, Todd seeks a declaratory judgment that he is free to solicit MOLLC employees as a result of MOLLC's breach of the Employment Agreement.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

118. Todd restates and realleges each of the foregoing allegations as if fully set forth herein.

119. Todd conferred a benefit on MOLLC and Samsung by leading his team to the highest weekly sales of Samsung products in each week of September 2022.

120. MOLLC knew and appreciated the benefit Todd conferred upon it, as evidenced by the fact they acknowledged him as the winner in each of the four weeks.

121. Under the circumstances, it would be inequitable for MOLLC to retain the benefit of Todd's efforts to sell Samsung products without payment of the value of such efforts, which MOLLC itself acknowledged was $4,000.

## SIXTH CAUSE OF ACTION
### (Attorneys' Fees)

122. Todd restates and realleges each of the foregoing allegations as if fully set forth herein.

123. In entering into the APA, the parties knew, expected and intended that Todd would receive a separate and direct benefit from it by receiving his own Employment Agreement for three years, which was attached as an Exhibit to the APA.

124. Consequently, Todd is an intended third-party beneficiary of the APA.

125. The APA contains an Attorneys' Fees provision providing as follows:

> 11.6 <u>Attorneys' Fees</u>. Without limiting any other provision hereof, if any action, suit, arbitration or other proceeding for the enforcement of this Agreement is brought, or because of analleged dispute, breach, default or misrepresentation in connection with any of the provisions hereof, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees andother costs incurred in that proceeding, in addition to any other relief to which it may be entitled.

126. This dispute is the type of dispute contemplated by the APA's Attorneys' Fees provision, because it is an action brought "because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions [of the APA]."

127. As an intended third-party beneficiary of the APA, Todd has standing to invoke the APA's Attorneys' Fees provision.

128. Thus, Todd is entitled to recover his reasonable attorneys' fees and other costs incurred in this proceeding.

## PRAYER FOR RELIEF

WHEREFORE, Todd prays for relief as follows:

I. For damages against MOLLC, including punitive damages, in an amount to be proven at trial, but in no event less than $787,000;

II.	For costs of suit and an award of reasonable attorneys' fees;

III.	For prejudgment interest at the rate provided by law; and

IV.	For any and all other relief as deemed just and appropriate by this Court.

## JURY DEMAND

Pursuant to FED. R. CIV. P. 38(b), Todd demands a jury trial for all issues so triable.

DATED this 17th day of March 2023.

                               STRONG & HANNI

                               */s/	Michael D. Stanger*
                               Michael D. Stanger
                               *Attorney for Todd Andra*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
TODD ANDRA, an individual

### DEFENDANTS
MOBILEONE, LLC an Arizona limited liability company

**(b)** County of Residence of First Listed Plaintiff: **Utah**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michael D. Stanger #10406
Miriam Allred #15982
STRONG & HANNI, PC

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [x] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**
PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

CIVIL RIGHTS
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

PRISONER PETITIONS
Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)
Brief description of cause:
Breach of Contract, Breach of the Covenant of Good Faith & Fair Dealing, Fraud in the Inducement, Wrongful Termination in Violation of Public Policy

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 787,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE: Mar 17, 2023
SIGNATURE OF ATTORNEY OF RECORD: /s/ Michael D. Stanger

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.